**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

CHRISTOPHER B.,[1]     )
           )
  *Plaintiff*,     )
           )
    v.      )   Civil No. 3:24-cv-392-SLS
           )
FRANK BISIGNANO,    )
Commissioner of Social Security, )
           )
  *Defendant*.    )
—————————————————)

## MEMORANDUM OPINION

  In this action, Plaintiff Christopher B. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny his Title II application for disability insurance benefits. This matter comes before the Court on cross-motions for summary judgment, which have been fully briefed, making this matter ripe for review. (ECF Nos. 13, 14, 15.) The Court exercises jurisdiction with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) (ECF Nos. 3, 16, 17) and pursuant to 42 U.S.C. § 405(g).

  Plaintiff moves the Court to reverse the Commissioner's decision denying him social security benefits and either find him disabled or remand this matter for further administrative proceedings consistent with the Court's decision. (ECF No. 13, at 1; ECF No. 14, at 1, 19.) As the basis for such relief, Plaintiff argues that the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") determination is not supported by substantial evidence because he: (1) erred in evaluating Plaintiff's subjective complaints by cherry-picking activities of daily living

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

to support a finding of no disability; (2) failed to include off-task limitations in the RFC assessment to account for Plaintiff's limitations; and (3) improperly evaluated the medical opinions of Drs. Swati Shah, Akm Sulaman, and Daniel Lawrence. (ECF No. 14, at 1, 12-19.)

In response, the Commissioner counters that the ALJ appropriately considered Plaintiff's subjective complaints and substantial evidence supports the ALJ's evaluation of Plaintiff's impairments. (ECF No. 15, at 25-30.) The Commissioner further argues that the ALJ properly considered and analyzed Drs. Shah, Sulaman, and Lawrence's medical opinions in accordance with the regulations. (ECF No. 15, at 16-25.) The Commissioner asks that the Court affirm the ALJ's decision. (ECF No. 15, at 2.)

For the reasons set forth below, the Court finds that the ALJ's consideration of Plaintiff's subjective complaints, physical and mental impairments, and the medical opinion evidence comports with applicable legal standards and that substantial evidence supports the ALJ's RFC determination. Therefore, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15), and AFFIRM the final decision of the Commissioner.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on November 6, 2020, alleging disability beginning on January 11, 2019. (Administrative Record ("R.") at 94.)[2] In his application, Plaintiff alleged that he suffered from severe Post-Traumatic Stress Disorder ("PTSD"), Major Depressive Disorder, anxiety disorder, degenerative arthritis, hypertension,

---

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. Civ. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this Memorandum Opinion. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

hyperlipidemia, diverticulitis, migraines, and sleep apnea. (R. at 95.) The SSA denied Plaintiff's claims initially and again upon reconsideration. (R. at 125-26, 131-32.) Plaintiff requested a hearing before an ALJ, and one was held on July 18, 2023. (R. at 38-68, 136-37.) At the administrative hearing, the ALJ granted Plaintiff's oral request to amend the alleged onset date of disability to March 10, 2020.[3] (R. at 18, 44-45.)

On September 22, 2023, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act"). (R. at 18-33.) On May 2, 2024, the SSA Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing

---

[3] On February 12, 2019, Plaintiff filed a prior application for disability insurance benefits as well as a Title XVI application for Supplemental Security Income, alleging disability beginning on January 11, 2019. (R. at 73.) After an administrative hearing, Plaintiff was denied benefits on March 9, 2020. (R. at 83.) The SSA Appeals Council denied Plaintiff's request for review on October 26, 2020, and Plaintiff did not seek judicial review. (R. at 88-90.)

the ALJ's five-step sequential evaluation).  At step one, the ALJ reviews the claimant's current work activity to determine if he or she has been participating in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the medical impairments meet or equal an impairment listed in the regulations.  *Id.* § 404.1520(a)(4)(iii).  Between steps three and four, the ALJ determines the claimant's RFC, which accounts for the most the claimant can do despite his or her impairments. *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform his or her past employment given his or her RFC.  *Id.* § 404.1520(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work.  *See Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  If such past work can be performed, then benefits will not be awarded, and the analysis ends.  *See* 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy.  *See id.* § 404.1520(a)(4)(v).  The Commissioner usually offers this evidence through the testimony of a vocational expert.  *See Mascio*, 780 F.3d at 635.

In reviewing a decision to deny benefits, the Court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Id.* at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could

4

accept as adequate to support a conclusion. *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The substantial evidence standard "presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts." *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion. *Id.*

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (second alteration in original)); *see Craig*, 76 F.3d at 589. The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If a fact is supported by substantial evidence, the Court must affirm, regardless of whether the Court agrees with such findings. *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the Court must reverse the decision. *See Breeden*, 493 F.2d at 1007.

## III.    THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim under the five-step evaluation process. (R. at 18-33); *see* 20 C.F.R. § 404.1520(a)(4); *Mascio*, 780 F.3d at 634. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 10, 2020 (the amended alleged onset date). (R. at 21.)

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: obesity, diabetes mellitus, headaches and/or migraine headaches, hypertension, knee degenerative joint disease, PTSD, peripheral neuropathy, osteoarthritis, and lumbar spinal stenosis.  (R. at 21.)

At step three, the ALJ concluded that Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 22-25.)  In making that finding, the ALJ considered the four broad areas of mental functioning (commonly called "paragraph B" criteria).[4]  (R. at 24-25.)  He found Plaintiff mildly limited in his ability to understand, remember, and apply information and moderately limited in his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself.  (R. at 24-25.)  Specifically, the ALJ acknowledged Plaintiff's reports of difficulties in these areas but also noted that Plaintiff could "handle self-care and personal hygiene; bathe, dress, prepare light meals, shop, drive, manage funds, deal appropriately with authority, and describe prior information and manage healthcare relationships to obtain beneficial outcomes." (R. at 25.)  In addition, Plaintiff completed testing to assess concentration and attention and demonstrated no issues with temper control.  (R at 25.)

The ALJ then determined Plaintiff's RFC.  (R. at 25-31.)  Based on the record, the ALJ found that Plaintiff retained the ability to perform light work as defined by 20 C.F.R. § 404.1567(b) with the following limitations:

---

[4] The SSA evaluates the effects of a mental disorder on four areas of mental functioning based on a five-part rating scale. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2). An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis in an area. C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(e). A marked limitation exists when an impairment seriously limits the ability to do the same. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(d). Moderate indicates a fair limitation, mild includes a slight limitation, and "no" or "none" means the claimant can function in the area independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(a)-(c).

> [Plaintiff] can climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; maintain balance over narrow, slippery, or erratically moving surfaces occasionally; stoop occasionally; never kneel; crouch occasionally; and never crawl. [Plaintiff] can work at unprotected heights occasionally; work in close proximity to (i.e., within arm's reach of) dangerous moving mechanical parts occasionally. [Plaintiff] is limited to working in a setting in which the noise level does not exceed loud noise. [Plaintiff] must avoid concentrated exposure to extreme cold; extreme heat; and excessive levels of dust, noxious odors, fumes, and pulmonary irritants. [Plaintiff] is able to perform simple, routine tasks; is limited to jobs that require no more than occasional interactions with supervisors and co-workers and require no interactions with the general public.

(R. at 25-26.)

In arriving at the RFC, the ALJ first summarized Plaintiff's subjective complaints. (R. at 26.) Plaintiff complained of "worsening headaches" that began in 2019. (R. at 26.) He reported headaches two to three times per week, each lasting two to three hours, that required him to lay in a closet and sometimes sleep. (R. at 26.) He testified to having popping and continuous pain in his left knee. (R. at 26.)[5] He reported being able to lift and carry 10 pounds and sit for 15 to 20 minutes. (R. at 26.) Plaintiff explained his PTSD symptoms, including experiencing flashbacks, nightmares three to four times a week, and having difficulty being around other people. (R. at 26.) He noted memory issues as well, stating he sometimes forgot to shower or brush his teeth. (R. at 26.)

Next, the ALJ summarized Plaintiff's medical records pertaining to his mental and physical impairments. (R. at 27-30.) Regarding the medical evidence that supports Plaintiff's knee impairments, the ALJ acknowledged Plaintiff's status post total left knee arthroplasty, right knee osteoarthritis, and degenerative joint and disc disease. (R. at 27.) In May 2016, Plaintiff

---

[5] The ALJ acknowledged Plaintiff's testimony that he has a service-connected disability of 90 percent (R. at 26) but noted that the disability determination criteria utilized by the Department of Veteran Affairs and the SSA are "very different." (R. at 30.) The ALJ explained that Department of Veteran Affairs' disability determination has "some probative value to the extent it is indicative of the existence of the[] alleged impairments," but "the disability rating itself has limited persuasive value." (R. at 30 (citing 20 C.F.R. § 404.1527(f)).)

underwent a total left knee arthroplasty. (R. at 27.) In May 2019, X-rays showed moderate right tricompartmental osteoarthritis with chondrocalcinosis in the right knee. (R. at 27.) In June 2022, X-rays of the left knee showed intact knee arthroplasty with probable sequela of prior anterior cruciate ligament repair, metallic anchor in the distal femur, lobulated soft tissue calcifications superior to the patella, and distal femur spurring at the margin of the femoral component of the prosthesis. (R. at 27.)

The ALJ, however, found Plaintiff's knee impairments were "medically managed" with "infrequent" and "conservative" treatment that had not required pain management or additional surgical intervention during the relevant period. (R. at 27.) Recent medical records documented infrequent treatment of knee pain and showed Plaintiff's knee discomfort improved with Naproxen. (*See* R. at 27.) Based on the medical records, the ALJ found Plaintiff's degenerative joint disease and osteoarthritis of the knees limited him to light exertional work with modified limitations, such as an ability to stoop, crouch, and climb ramps and stairs occasionally, but never kneel, crawl, or climb ladders, ropes, or scaffolds. (R. at 27.)

The ALJ also considered Plaintiff's history of recurring headaches and migraines but emphasized that those impairments were "medically managed" and "stable with medication management," such as Eletriptan and Topiramate. (R. at 28.) The ALJ determined that "when compliant with his medication, [Plaintiff's] headaches [were] stable, with more recurrent headaches when [he was] not medication compliant." (R. at 28.) For instance, in January 2021, Plaintiff reported three to four headaches per week, but treatment records showed he had not refilled his migraine medication since June 2020. (R. at 28.) By contrast, in May 2022, Plaintiff reported medication compliance and that his headaches had stabilized. (R. at 28-29.) In addition, treatment records did not show nausea, vomiting, or concentration issues associated with

Plaintiff's headaches, and imaging did not show any brain abnormalities. (R. at 28.) The ALJ concluded that "[w]hile [Plaintiff]'s headaches may inhibit activity, the evidence [did] not suggest that headaches wholly prevent usual activity, or that headaches [were] worsened by routine physical activity." (R. at 28.) To accommodate Plaintiff's headaches, the ALJ limited Plaintiff to occasional work at unprotected heights, occasional work in close proximity to dangerous moving mechanical parts, work in which the noise level did not exceed loud noise, and no concentrated exposure to extreme cold, heat, dust, noxious odors, fumes, and pulmonary irritants. (R. at 28.)

The ALJ found that Plaintiff's mental impairments warranted further limitations within the RFC, including a limitation to simple, routine tasks, no more than occasional interaction with supervisors and coworkers, and no interaction with the general public. (R. at 29-30.) The ALJ explained that while Plaintiff noted ongoing anxiety and periods of suicidal ideation, his mental impairments improved with medication adjustments and individual and group therapy. (R. at 29.) Examination records showed Plaintiff was able to interact with treatment providers and respond appropriately to traumatic events, such as the death of a friend. (R. at 29.) Moreover, there was no history of decompensation requiring hospitalization related to his mental impairments. (R. at 29.) The ALJ also emphasized that Plaintiff was "independent and self-sufficient in a wide range of activities of daily living." (R. at 30.) For instance, Plaintiff could manage self-care, such as bathing and dressing, prepare simple meals, perform some housework with assistance from family members, do limited yard work, grocery shop twice a week, drive less than one hour, and handle finances and pay bills. (R. at 30.)

For these reasons, the ALJ concluded that Plaintiff's "testimony regarding the extent of [his] symptoms and limitations [was] not fully supported" by the record evidence, but he

incorporated limitations in the RFC based on Plaintiff's subjective complaints "to the extent that they [were] consistent with the evidence as a whole." (R. at 31.)

The ALJ also considered the medical opinions and prior administrative medical findings. (R. at 27-30.) The ALJ first considered the medical opinion of consultative examiner, Dr. Lawrence. (R. at 27-28.) In July 2022, Dr. Lawrence opined that Plaintiff could stand, walk, and sit for less than two hours; lift and carry 25 pounds frequently and 50 pounds occasionally; climb, balance, and stoop occasionally; reach frequently; and never kneel, crouch, or crawl. (R. at 28.) Dr. Lawrence also imposed environmental limitations against heights, heavy machinery, temperature extremes, fumes, and noise. (R. at 28.) The ALJ found Dr. Lawrence's opinion overly restrictive, unsupported by his own examination findings, inconsistent with other substantial record evidence, and therefore unpersuasive. (R. at 28.)

The ALJ then considered the medical opinion of Dr. Shah, Plaintiff's treating provider. (R. at 29.) In a 2021 Residual Functional Capacity Assessment, Dr. Shah noted that Plaintiff's headaches and stress rendered him incapable of even low stress work. (R. at 29.) Dr. Shah indicated that Plaintiff would need three to four breaks a week and would likely be absent from work more than four days a month. (R. at 29.) The ALJ found Dr. Shah's opinion overly restrictive, not supported by his own treatment notes, inconsistent with the longitudinal treatment record, and therefore unpersuasive. (R. at 29.) Specifically, the ALJ explained that the medical record showed Plaintiff's headaches stabilized when he was medication compliant and Dr. Shah's opinion was issued when Plaintiff had not refilled his medication in over six months. (R. at 29.)

The ALJ also considered the medical opinion of Dr. Sulaman. (R. at 30.) In March 2021, Dr. Sulaman opined that Plaintiff's mental limitations caused marked to extreme limitations in adaptation, sustaining concentration, persistence, and social interaction. (R. at 30.) The ALJ found

Dr. Sulaman's opinion unpersuasive.  (R. at 30.)  He explained that the longitudinal treatment record showed improvement with medication, normal mental status examinations, no issues with attention or concentration, and active engagement in therapy sessions.  (R. at 30.)  The ALJ, however, acknowledged that Plaintiff's PTSD and associated nightmares and sleep issues could cause "some limitation in ability to concentrate and attend to detailed tasks," but he accommodated any limitations by restricting Plaintiff to simple, routine tasks.  (R. at 29-30.)

The ALJ found prior administrative medical findings pertaining to Plaintiff's RFC more persuasive, internally consistent, and generally consistent with the record.  (R. at 30.)  Regardless, the ALJ assigned even "greater limitations" in Plaintiff's RFC "to better account for [his] impairments."  (R. at 30.)

At step four, the ALJ found that Plaintiff could not perform his past relevant work considering his RFC.  (R. at 31.)  At step five, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy considering his age, education, work experience, and RFC.  (R. at 31-32.)  Therefore, the ALJ found Plaintiff not disabled from March 10, 2020 (the amended alleged onset date) through September 22, 2023 (the date of the decision).  (R. at 32-33.)

## IV.    ANALYSIS

Plaintiff raises three challenges to the ALJ's decision.  The Court addresses each argument below and finds no reversible error.

### A.  The ALJ Applied Correct Legal Standards in Evaluating Plaintiff's Subjective Complaints, and Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff argues that the ALJ erred in evaluating his subjective complaints.  (ECF No. 14, at 14-17.)  Specifically, Plaintiff argues that the ALJ "cherry pick[ed] evidence" regarding his daily activities and "gloss[ed] over [his] statements" to discount his credibility.  (ECF No. 14, at

17.)   Contrary to Plaintiff's argument, the ALJ evaluated Plaintiff's subjective complaints as required by applicable legal standards and did not selectively consider the record evidence. Substantial evidence supports the ALJ's RFC determination.

### 1.  Standard for Evaluating Subjective Complaints

The regulations provide a two-step process for evaluating Plaintiff's subjective complaints. 20 C.F.R. § 404.1529; *see also* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  First, "the ALJ must determine whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (citing 20 C.F.R. § 404.1529(b); SSR 16-3p).  Second, "after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.*  The ALJ must consider all available evidence in this determination, including objective medical evidence, an individual's statements about the intensity, persistence, and limiting effects of the symptoms, and medical opinions and statements from others.  *Id.*  The claimant does not need to produce objective evidence to satisfy this second prong.  *Id.*

### 2.  The ALJ Properly Evaluated Plaintiff's Subjective Complaints

Here, the ALJ followed the two-step process in considering Plaintiff's subjective complaints.  At the first step, the ALJ found that Plaintiff's medically determinable impairments could lead to the alleged symptoms.  (R. at 26.)  At the second step, and "[a]fter careful consideration of the evidence," the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (R. at 26.)  While Plaintiff contends that the ALJ failed to comply with his obligations

12

under the second step by "cherry picking evidence" from the record (ECF No. 14, at 17), the ALJ's decision shows otherwise.

The ALJ acknowledged Plaintiff's impairments and provided a summary of the medical record, treatment plan, and Plaintiff's daily activities. (R. at 26-31.) Following the ALJ's evaluation of Plaintiff's symptoms and analysis of the record, the ALJ determined that Plaintiff's "testimony regarding the extent of [his] symptoms and limitations [was] not fully supported" by the record evidence. (R. at 31.) The ALJ added that Plaintiff's "complaints [were not] completely dismissed, but rather, [were] included in the [RFC] to the extent that they [were] consistent with the evidence as a whole." (R. at 31.) The ALJ supported these conclusions by identifying inconsistencies between Plaintiff's subjective complaints and Plaintiff's medical record, conservative treatment plan, and activities. (R. at 26-31.) This constitutes substantial evidence supporting the ALJ's RFC assessment.

a.  The ALJ Properly Considered Plaintiff's Conservative Treatment in Discounting His Subjective Complaints of Knee Pain.

The ALJ cited Plaintiff's "infrequent" and "conservative" treatment for degenerative joint disease and osteoarthritis of the knees as support for his conclusion that Plaintiff's symptoms were not as severe or as limiting as he alleged. (R. at 27.) Plaintiff has not required surgical intervention since undergoing a total left knee arthroplasty in March 2016, four years before the amended alleged onset date. (R. at 27.) Although Plaintiff was prescribed Naproxen, a nonsteroidal anti-inflammatory drug for knee pain, he did not require other pain management. (R. at 27.) Thus, Plaintiff's knee impairments were "medically managed" and did not require anything more than conservative treatment during the relevant period. (R. at 27.) Substantial evidence supports the ALJ's characterization of Plaintiff's treatment as conservative and medically managed. (R. at 27.)

Plaintiff argues that the ALJ's reliance on conservative treatment with no pain management or surgical intervention disregards evidence showing his status post knee surgery and that he takes pain medication every day. (ECF No. 14, at 16.) The ALJ, however, acknowledged Plaintiff's status post total left knee arthroplasty, but noted that the record reflected no other surgical intervention during the relevant disability period. (R. at 27.) The ALJ also acknowledged that Plaintiff took Naproxen, which "helped his knee discomfort." (R. at 27.) Additionally, at the hearing, Plaintiff testified that he took Tylenol and Ibuprofen as needed on a daily basis for pain. (R. at 56.) The ALJ did not err by noting that Plaintiff's conditions did not otherwise require pain management services.

While Plaintiff reported having continuous knee pain at the hearing (R. at 55), the ALJ weighed that testimony alongside other statements and omissions throughout the period at issue indicating that his symptoms had improved. During multiple appointments, Plaintiff indicated that his symptoms improved with Naproxen. (R. at 27, 384, 533, 564, 607, 647.) The medical records also showed no complaints of knee pain since the alleged onset date, as amended. (*See* R. at 27, 562 (no reports of knee pain in March 2020).)

Based on the above, the ALJ reasonably considered Plaintiff's "conservative" treatment plan and his reports of its effectiveness in weighing his subjective complaints. *See Dunn*, 607 F. App'x at 273-74. Moreover, the ALJ made clear that Plaintiff's "complaints [were not] completely dismissed" and were "included in the [RFC] to the extent that they [were] consistent with the evidence as a whole." (R. at 31.) Specifically, the ALJ limited Plaintiff to light exertional work; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally maintaining balance, stooping, and crouching; and never kneeling or crawling based on his knee impairments. (R. at 25, 27.) Substantial evidence supports the ALJ's RFC determination.

14

      b.  <u>The ALJ Properly Considered Plaintiff's Ability to Concentrate, Persist, or Maintain Pace in Finding His Subjective Complaints Overstated.</u>

Plaintiff argues that the ALJ improperly diminished his testimony that his headaches severely limited his ability to concentrate, persist, or maintain pace.  (ECF No. 14, at 16.)  The Court disagrees.

The ALJ considered the medical record pertaining to Plaintiff's migraines and found them "stable with medication management."  (R. at 28.)  Specifically, "when compliant with his medication, his headaches are stable, with more recurrent headaches when [Plaintiff] is not medication compliant."  (R. at 28.)  The ALJ concluded that the record did not support nausea, vomiting, photophobia, or phonophobia as symptoms of Plaintiff's headaches, nor did it "show interruptions in [Plaintiff]'s ability to concentrate, persist, and maintain pace *attributable to headaches*."  (R. at 28 (emphasis added).)  Nonetheless, the ALJ included environmental limitations in the RFC based on Plaintiff's migraines, including that Plaintiff could work in a setting in which the noise level does not exceed loud noise and must avoid concentrated exposure to extreme cold, extreme heat, and excessive levels of dust, noxious odors, fumes, and pulmonary irritants.  (R. at 28.)

The ALJ also acknowledged that Plaintiff did have some concentration and focus issues but found those attributable to his mental impairments.  (R. at 30.)  The ALJ therefore found it appropriate to limit Plaintiff to simple, routine tasks, occasional interaction with supervisors and coworkers, and no interaction with the general public as a result.  (R. at 29.)

In challenging the RFC finding, Plaintiff argues that the ALJ ignored his testimony and the medical record in several respects.  First, Plaintiff contends the ALJ failed to consider his testimony that he retired from the Defense Logistics Agency in December 2019 because he "could not keep up with the workload" and "was having a lot of migraines [and] mental health issues."

(ECF No. 14, at 16 (citing R. at 46).)  Contrary to Plaintiff's argument, that testimony does not suggest concentration issues attributable to migraines.  (*See* R. at 46, 58-60.)  Instead, Plaintiff testified that his mental impairments, including his anxiety and depression, led him to retire.  (R. at 58-59.)  Plaintiff described his prior work as involving critical safety concerns, including ordering aircraft parts for war fighters.  (R. at 59.)  He found it stressful, felt unsupported, and worried about getting soldiers hurt, which led him to medically retire.  (R. at 59-60.)

Next, Plaintiff cites treatment records from a mental health provider to support his argument that concentration issues arose from his migraines.  (*See* ECF No. 14, at 16 (citing R. at 779).)  This reliance is misplaced and, in fact, supports the ALJ's decision.  For example, the psychiatrist notes from January 2019 indicate Plaintiff's inability to concentrate and maintain focus stemmed from his "increased anxiety and intensification of PTSD symptoms."  (R. at 779.)  Indeed, there is no reference to headaches or migraines in the psychiatrist's notes from that examination.  (*See* R. at 778-81.)  Instead, the record provides substantial support for the ALJ's finding that Plaintiff's moderate concentration and focus issues stemmed from his mental impairments, not migraines.  (R. at 464, 734-35, 779, 946-47, 1132, 1175.)

Considering Plaintiff's testimony and the record, the ALJ reasonably limited Plaintiff to simple, routine tasks based on Plaintiff's concentration and focus issues.  (R. at 29.)  Because the ALJ applied correct legal standards and substantial evidence supports his RFC determination, the Court finds no error.

c.  <u>The ALJ Properly Considered the Extent to Which Plaintiff Performed His Activities of Daily Living.</u>

The ALJ also considered inconsistencies between Plaintiff's subjective complaints of mental impairments and his "wide range" of daily activities.  (R. at 30.)  The ALJ noted that Plaintiff could live independently, perform self-care, prepare simple meals, complete some

household cleaning with assistance from family members, do limited yard work, briefly grocery shop twice a week, drive less than one hour, and handle finances and pay bills. (R. at 30.) The ALJ properly considered Plaintiff's activities along with other evidence in determining that Plaintiff could perform light work with additional restrictions to account for his mental impairments.

Plaintiff vaguely argues that the ALJ erred by failing to discuss the extent to which Plaintiff could perform his daily activities.[6] (ECF No. 14, at 14-17.) Indeed, in assessing a claimant's daily activities, the ALJ must consider both the types of activities that a claimant can perform and the extent to which a claimant can perform them. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). The ALJ complied with this requirement. (*See* R. at 30.) For example, the ALJ acknowledged that Plaintiff could prepare *simple* meals, including sandwiches and microwave meals, and *briefly* shop for groceries twice a week. (R. at 30.) The ALJ also stated Plaintiff could "do *some* housework and housecleaning, with assistance from family members" and "*limited* yard work." (R. at 30 (emphases added).) Therefore, the ALJ did not simply consider the types of activities that Plaintiff could perform, but also the extent to which he could perform them. (R. at 30); *see Dangelette D. v. Saul*, No. 3:19-cv-358, 2020 WL 5046293, at *4 (E.D. Va. Aug. 26, 2020).

Moreover, the ALJ considered these activities of daily living alongside other record evidence regarding the extent of Plaintiff's mental impairments. (R. at 29-30.) The medical record showed "no history of decompensation requiring hospitalization" and instead reflected that

---

[6] Plaintiff cites *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020) in support of his argument. (ECF No. 14, at 15-16.) That case is distinguishable. Unlike the ALJ in *Arakas*, the ALJ here "[did not] selectively cite[] evidence concerning tasks which [Plaintiff] was capable of performing", or "improperly disregard[] [his] qualifying statements regarding the limited extent to which [he] could perform daily activities." *Arakas*, 983 F.3d at 99-100.

Plaintiff's mental impairments remained stable with medication and therapy.  (R. at 29.)  The ALJ also noted that while Plaintiff avoided crowds, he otherwise interacted appropriately with providers.  (R. at 29-30.)

Based on these factors, the ALJ limited Plaintiff to simple, routine tasks, no interaction with the general public, and no more than occasional interaction with supervisors and coworkers based on his mental impairments.  (R. at 29.)  The Court finds no error in the ALJ's consideration of Plaintiff's daily activities as one factor in the analysis.

**B.    Substantial Evidence Supports the ALJ's RFC Determination, Including the Omission of Any "Off-Task" Limitation**

Plaintiff next argues that the ALJ "fail[ed] to account" for his "time off task and inability to maintain time and [consistent] attendance" in the RFC determination.  (ECF No. 14, at 17-18.) He contends that his headaches, pain, and mental impairments affect his ability to concentrate and cause him to be off task during the workday.  (ECF No. 14, at 18.)  Review of the record, as discussed above, establishes that the ALJ reasonably accounted for any limitations stemming from his knee pain, migraines, and mental impairments.

Regarding his physical impairments, the ALJ found Plaintiff's pain controlled during the relevant period and that his migraines did not disrupt his ability to concentrate, persist, and maintain pace.  (R. at 28.)  Regarding his mental impairments, the ALJ acknowledged that Plaintiff's "sleep issues relating to his nightmares due to PTSD . . . could cause him to have *some* limitation in ability to concentrate and attend to detailed tasks."  (R. at 30 (emphasis added).) Based on those findings, the ALJ did not find it appropriate to include an off-task limitation in the RFC, and instead limited Plaintiff to simple, routine tasks.  (R. at 29-30.)  As discussed above, those conclusions find substantial support in the record and should not be disturbed.

C. **The ALJ Applied Correct Legal Standards in Evaluating Drs. Shah, Sulaman, and Lawrence's Medical Opinions, and Substantial Evidence Supports the ALJ's Findings**

Plaintiff also argues that the ALJ failed to properly consider the medical opinions of Drs. Shah and Sulaman, Plaintiff's treating providers, and Dr. Lawrence, a consultative examiner, in accordance with applicable regulations. (ECF No. 14, at 12-14.) As discussed below, the Court finds that the ALJ adequately explained why he found those opinions unpersuasive given their lack of support and inconsistency with record evidence and that substantial evidence supports the ALJ's findings.

### 1. *Applicable Regulations for Evaluating Medical Opinion Evidence*

Under applicable regulations,[7] the ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources without deferring or giving any specific evidentiary weight to any medical source. 20 C.F.R. § 404.1520c(a). Specifically, the ALJ must articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id.* § 404.1520c.

Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered. *Id.* § 404.1520c(b)(2). The regulations define supportability and consistency as follows:

(1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

---

[7] Claims involving medical opinion evidence filed on or after March 27, 2017, are evaluated using a revised regulatory framework. 20 C.F.R. § 404.1520c.; (*see also* ECF No. 14, at 12; ECF No. 15, at 16-17.)

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

*Id.* § 404.1520c(c)(1)-(2).  The ALJ may, but is not required to, explain how the other factors were considered.  *Id.* § 404.1520c(b)(2).

### 2. *Dr. Shah's Opinion and the ALJ's Assessment*

Dr. Shah began treating Plaintiff in March 2014 and provided a headaches medical source statement on January 26, 2021.  (R. at 357-63.)  Dr. Shah reported that Plaintiff suffered from three to four "moderate" headaches per week, each lasting two to three hours, with associated vertigo, nausea, concentration deficits, impaired sleep, and mood changes.  (R. at 357.)  She indicated that bright lights, noise, and stress triggered Plaintiff's migraine headaches.  (R. at 358.)   After an interview and review of Plaintiff's chart, including Plaintiff's own statements that he could not work due to recurrent headaches, Dr. Shah opined that Plaintiff was incapable of low stress work.  (R. at 358.)  Dr. Shah further noted that Plaintiff would need to take three to four unscheduled breaks throughout the workweek to lie down and would be absent from work more than four days per month due to his migraines.  (R. at 359.)

Dr. Shah, however, could not answer how often Plaintiff would likely be "off task," i.e., "what percentage of a typical workday would [Plaintiff]'s symptoms likely be severe enough to interfere with *attention and concentration* needed to perform even simple work tasks?"  (R. at 359 (emphasis in original).)  Dr. Shah also opined that Plaintiff had no other limitations, such as a need to avoid temperature extremes or noises.  (R. at 361.)  Instead, Dr. Shah advised Plaintiff to take medication to prevent migraines.  (R. at 359.)

After summarizing Dr. Shah's opinion, the ALJ found it "not persuasive." (R. at 29.) The ALJ explained that the severe limitations within Dr. Shah's opinion were overly restrictive, not supported by the treating provider's own records, and inconsistent with the longitudinal treatment record. (R. at 29.) The ALJ emphasized that despite Plaintiff's complaints of recurrent headaches, Dr. Shah's treatment records showed Plaintiff had not refilled his medication for migraine headaches in over six months. (R. at 29, 382.) In addition, the ALJ found that the records generally showed Plaintiff's headaches stabilized when he was compliant with his medications. (R. at 29.) Based on this evidence, the ALJ found Plaintiff not nearly as limited as opined by Dr. Shah's evaluation. (R. at 29.)

Contrary to Plaintiff's argument that the ALJ's analysis of Dr. Shah's opinion "falls apart when scrutinized" (ECF No. 14 at 13), the ALJ's analysis and decision builds a logical bridge between the evidence he considered and his conclusion that the level of limitations opined by Dr. Shah were unsupported and inconsistent with the record. Regarding supportability, the ALJ noted that Dr. Shah's treatment notes indicated that Plaintiff had not refilled his medication for migraine headaches in over six months, despite complaining of debilitating headaches three to four times per week. (R. at 29, 382.) Indeed, Dr. Shah noted that Plaintiff had been prescribed Topiramate and Sumatriptan to prevent his migraines but had not refilled Topiramate since June 2020 and Sumatriptan since June 2019. (R. at 382.)[8] Regarding consistency, the ALJ found substantial

---

[8] Plaintiff further contends that the ALJ failed to properly discuss Plaintiff's periods of medication noncompliance in violation of Social Security Ruling 16-3p. (ECF No. 14, at 13.) This argument is misplaced. Under that ruling, the ALJ may find the claimant's alleged symptoms inconsistent with the overall evidence of record when he fails to follow prescribed treatment that might improve symptoms but must first consider possible reasons he may not comply with treatment. SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). Here, Plaintiff seems to argue that he did not comply with treatment because it did not work to improve his headaches. (ECF No. 14, at 13-14.) The ALJ, however, noted that "[t]he medical evidence of record reflects that, when compliant with his

record evidence showing that Plaintiff's headaches were stable with medication compliance and were therefore not as limiting as opined by Dr. Shah. (R. at 29.) For example, in July 2022, Plaintiff reported "stable but chronic migraine headaches" that were "presently relieved with [S]umatriptan." (R. at 1409-16.) Therefore, the ALJ properly considered Dr. Shah's opinion in accordance with applicable regulations, and substantial evidence supports the ALJ's conclusions.[9]

### 3. Dr. Sulaman's Opinion and the ALJ's Assessment

Dr. Sulaman completed a mental capacity assessment on March 11, 2021, which was also the first day he treated Plaintiff. (R. at 993.) He listed Plaintiff's diagnoses as PTSD, depressive disorder, sleep apnea, and headaches. (R. at 991.) Dr. Sulaman opined that Plaintiff had extreme limitations (unable to function) in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and week without interruptions from psychologically based symptoms, and set realistic goals or make plans independently of others. (R. at 991-92.) He further opined that Plaintiff had marked limitations (unable to function for two-thirds of an eight-hour workday) in the ability to carry out detailed instructions, work in

---

medication, [Plaintiff's] headaches [were] stable, with more recurrent headaches when [he was] not medication compliant." (R. at 28.) Indeed, in January 2021, Plaintiff noted the medications "[weren't] working much anyway," but Dr. Shah remarked that he had not refilled those medications in months. (R. at 382, 388.) Moreover, two years later, Plaintiff reported "intermittent severe migraines" that were "relieved with [S]umatriptan," the same medication previously prescribed by Dr. Shah. (R. at 1410.) Thus, contrary to Plaintiff's argument, his failure to comply with medication that improved his headaches undercuts his statements about the severity of his condition.

[9] To the extent Plaintiff takes a different view of the evidence (ECF No. 14, at 13-14), the Court cannot reweigh conflicting evidence or substitute its judgment for that of the ALJ. *See Hancock*, 667 F.3d at 472. Here, the ALJ considered the medical record pertaining to Plaintiff's migraine headaches but did not draw the inferences or conclusions Plaintiff wanted. Plaintiff has failed to explain or otherwise show that the ALJ committed legal error and instead invites the Court to reweigh the evidence in his favor, which the Court is not permitted to do.

coordination with or in proximity to others without being distracted, perform at a consistent pace with normal breaks, accept instructions, get along with coworkers or peers, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation.  (R. at 991-92.)  Dr. Sulaman also found Plaintiff would likely be absent from work more than four days a month.  (R. at 991.)  In all other areas of functioning, Dr. Sulaman found only moderate, slight, or no limitations.  (R. at 991-92.)

After summarizing Dr. Sulaman's opinion, the ALJ found it "not persuasive," explaining that it was not consistent with other opinions in the record[10] and not supported by the longitudinal treatment record.  (R. at 30.)  Although the ALJ acknowledged that Plaintiff's sleep issues due to his PTSD and related nightmares would cause "*some* limitation in ability to concentrate and attend to detailed tasks," he stated that no other treating providers noted any issues with attention or concentration.  (R. at 30 (emphasis added).)  Indeed, Plaintiff was described as "actively engaged" in therapy sessions.  (R. at 30.)  The ALJ also emphasized that Dr. Sulaman's opinion was inconsistent with Plaintiff's normal mental status findings and good response to medication.  (R. at 30.)  In addition, the ALJ otherwise noted that the record contained "no history of decompensation requiring hospitalization" and otherwise showed that Plaintiff was "independent and self-sufficient in a wide range of activities of daily living."  (R. at 29-30.)  The ALJ accommodated Plaintiff's mental impairments by limiting him to simple, routine tasks and jobs

---

[10] Contrary to Plaintiff's position (ECF No. 14, at 12-14), the ALJ's conclusion that Dr. Sulaman's opinion was consistent with other opinions in the record appears to have been a typo.  (R. at 30.)  Aside from a marked limitation in interacting with the general public, no other opinion assigned marked or extreme limitations to Plaintiff's mental functioning.  Instead, state agency mental health consultants found Plaintiff could perform simple and routine tasks with additional limitations on interacting with others.  (R. at 30, 99, 102, 111, 117.)  Regardless, this typo—or discrepancy, as Plaintiff suggests—does not undermine the ALJ's other reasons for discounting Dr. Sulaman's opinion.

that required no more than occasional interaction with supervisors and coworkers and no interaction with the general public. (R. at 29.) In doing so, he sufficiently explained that the additional limitations opined by Dr. Sulaman were not supported by the record evidence.

Plaintiff asserts that the ALJ erred in finding Dr. Sulaman's opinion inconsistent with the generally normal mental status findings in the record evidence because "multiple doctor visits and mental status examinations" documented "increased mental health symptoms." (ECF No. 14, at 14.) Once again, Plaintiff requests the Court to reweigh the evidence, which as discussed above, the Court cannot do. *See Hancock*, 667 F.3d at 472. Substantial evidence supports the ALJ's conclusion that the longitudinal treatment record, including normal mental status findings throughout the record, did not support the overly restrictive limitations opined by Dr. Sulaman. (*See, e.g.*, R. at 29-30 (citing R. at 450 (noting Plaintiff's recent medication adjustment improved his mood, nightmares, and sleep), 539 (indicating Plaintiff was "doing much better with medication"), 1577 ("[Plaintiff] report[ed] that despite [familial and financial stressors] he remain[ed] resilient and positive.").) The Court declines to reweigh the evidence and finds no error in the ALJ's assessment of Dr. Sulaman's opinion.

### 4. *Dr. Lawrence's Opinion and the ALJ's Assessment*

On July 16, 2022, Dr. Lawrence examined Plaintiff and completed a physical evaluation report. (R. at 1409-16.) At the examination, Dr. Lawrence observed that Plaintiff could walk independently with a slow non-antalgic gait and a brace on the left knee, but he could not tandem walk, hop, or squat. (R. at 1413.) Dr. Lawrence noted mild osteoarthritis joint deformities in the bilateral fingers and knees, no muscle spasms or atrophy, normal 5/5 strength in the upper and lower extremities, normal deep tendon reflexes, and no muscle tenderness or trigger points. (R. at 1413-14.) He described normal range of motion in all extremities and localized pain with extremes

24

of range of motion in the neck, lumbar spine, and bilateral knees that was relieved with repositioning.  (R. at 1414.)   Based on these findings, Dr. Lawrence opined that Plaintiff's osteoarthritis would limit him to standing, walking, and sitting for less than two hours; occasionally lifting or carrying 50 pounds and frequently lifting and carrying 25 pounds; occasionally climbing, balancing, and stooping; never kneeling, crouching, or crawling; but he was capable of frequent reaching with no limitations on handling, fingering, or feeling.  (R. at 1415-16.)  Dr. Lawrence also found Plaintiff's PTSD and migraine headaches limited his ability to work around heights, heavy machinery, extreme temperatures, chemicals, dust, fumes, gases, and excessive noise.  (R. at 1416.)

After summarizing Dr. Lawrence's opinion, the ALJ found it "not persuasive."  (R. at 28.) Regarding supportability, the ALJ found Dr. Lawrence's opinion overly restrictive and internally inconsistent with the narrative of his findings from his examination.  (R. at 28.)  For example, Dr. Lawrence found Plaintiff's osteoarthritis limited him to standing and walking for less than two hours.  (R. at 28.)  The ALJ found these limitations contradicted by Dr. Lawrence's other findings, including that Plaintiff could walk independently with a slow non-antalgic gait and a brace on the left knee, had full range of motion in both knees with "4/10 localized pain" at the end range of motion, exhibited normal 5/5 strength in the lower extremities, and had only mild osteoarthritis joint deformities in the knees.  (R. at 27-28.)  Moreover, the ALJ found Dr. Lawrence's lifting and carrying limitations "unreasonable" as Plaintiff demonstrated 5/5 strength in the upper extremities on examination.  (R. at 28.)  Based on this evidence, the ALJ properly considered Dr. Lawrence's supporting explanations and articulated why he found portions of that opinion internally inconsistent with those explanations.  (R. at 27-28.)

Regarding consistency, the ALJ found the limitations opined by Dr. Lawrence inconsistent with the results of clinical testing, treatment notes, diagnoses, and physical examination findings. (R. at 28.)  The ALJ cited portions of the record showing that Plaintiff received "infrequent" treatment for his knee and back impairments and that his knee and back pain had been treated conservatively and improved with medication.  (R. at 27; R. at 427, 564 (Exhibit B2F); R. at 1291 (Exhibit 7BF); R. at 1490, 1552, 1659-60, 1730 (Exhibit B11F).)  This constitutes substantial evidence supporting the ALJ's conclusion that Dr. Lawrence's opinions were inconsistent with the medical record.[11]

## V.    CONCLUSION

For the reasons set forth above, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15), and AFFIRM the final decision of the Commissioner.  An appropriate Order will accompany this Memorandum Opinion.

/s/ 

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: September 30, 2025

---

[11] Plaintiff vaguely contends that the ALJ erred in finding Dr. Lawrence's opinion inconsistent with the record evidence given Plaintiff's past total knee replacement and emergency room visits for back pain.  (ECF No. 14, at 13.)  This argument again amounts to a request to reweigh evidence, and once again, must fail. *See Hancock*, 667 F.3d at 472.